IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,270

In the Matter of the Petition for a Writ of Habeas Corpus
by RICTOR BOWMAN.

SYLLABUS BY THE COURT

1.

A writ of habeas corpus filed under K.S.A. 2018 Supp. 60-1501 is a proper remedy for challenging a district judge's pretrial denial of a claim of double jeopardy.

2.

A petitioner in a habeas corpus proceeding under K.S.A. 2018 Supp. 60-1501 has the burden of establishing a right to relief.

3.

The fundamental rule of statutory interpretation is that legislative intent governs. And the best avenue for discerning that intent is to read the language of the statute, giving common words their ordinary meaning. If the statute contains plain and unambiguous language, courts do not look to extrinsic aids for guidance on legislative history because the statutory language is the best and only safe rule for determining the intent of the creators of written law. If, however, the statute's text is unclear or ambiguous, courts turn to tools of statutory construction such as canons of construction and legislative history to determine the Legislature's intent.

4.

The plain language of the mistrial statute, K.S.A. 22-3423, does not permit a mistrial to be declared over a defendant's objection when the prosecutor chooses to open the State's case with hearsay evidence; a proper defense objection to that evidence is overruled; and anticipated testimony from a child hearsay declarant fails to materialize because the child refuses to take the oath when called to the witness stand.

5.

The plain language of the Kansas double jeopardy statute, K.S.A. 2018 Supp. 21-5110(a)(3), bars a second trial when (1) the State formerly prosecuted a defendant for the same crime, based on the same facts; (2) the previous prosecution was terminated without the consent of the defendant after having been placed in jeopardy; and (3) no exception listed in the statute applies. An improperly declared mistrial under K.S.A. 22-3423 is not one of the exceptions in the double jeopardy statute; thus it does not permit a second trial.

Original proceeding in habeas corpus. Opinion filed May 17, 2019. Writ is granted.

*Mark J. Dinkel*, public defender, argued the cause and was on the briefs for petitioner.

*Christine M. T. Ladner*, assistant county attorney, argued the cause, and *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for respondent.

PER CURIAM:  Rictor Bowman seeks habeas relief, challenging whether the State can pursue a second trial against him on criminal charges. His first trial ended after the district judge declared a mistrial because the alleged victim, a young child, did not respond when asked to take the oath required of all witnesses. Bowman now argues a second trial would violate the double jeopardy protections of the United States Constitution, the Kansas Constitution Bill of Rights, and Kansas statutes.

2

We resolve this case by applying the plain language of K.S.A. 22-3423 and K.S.A. 2018 Supp. 21-5110. K.S.A. 22-3423 identifies situations in which a district judge has the discretion to grant a mistrial. K.S.A. 2018 Supp. 21-5110 allows a second trial of a criminal defendant only in certain circumstances. We conclude that the declaration of mistrial in this case was error and that none of the circumstances allowing a second trial under K.S.A. 2018 Supp. 21-5110 applies. Bowman is therefore entitled to the habeas relief he seeks, and this court hereby orders dismissal of this case and Bowman's release from any confinement arising out of it.

FACTS AND PROCEDURAL HISTORY

The State charged Bowman with rape in violation of K.S.A. 2016 Supp. 21-5503(a)(3); aggravated criminal sodomy in violation of K.S.A. 2016 Supp. 21-5504(b)(1); and four counts of intimidation of a witness or victim under K.S.A. 2016 Supp. 21-5909(a)(2)(B). The charges stemmed from Bowman's alleged sexual abuse of his three-year-old granddaughter.

The State filed charges after the Salina Police Department investigated a report made by the alleged victim's mother. The mother related that she had been shopping with her daughter when, in the middle of a store, her daughter blurted out that Bowman had put his hands down the child's pants. Reportedly, without prompting, the child then showed how Bowman had touched her.

As part of the investigation, a detective conducted and recorded an interview of the child. The child relayed information about sexual contact between her and Bowman, including more contact than the reported touching. Her statements and the remainder of the investigation led to Bowman being charged with rape and aggravated criminal sodomy. At the preliminary hearing on the charges, the district judge watched a video

3

recording of the child's forensic interview at the Child Advocacy Center. The judge found probable cause to believe the felonies had been committed and that Bowman had committed them.

Before trial, the State moved to present the child's testimony through closed circuit television broadcast under K.S.A. 22-3434 (video testimony of child victim admissible in specified cases) and asked that a comfort person be allowed to sit with the child while she testified. See *State v. Rochelle*, 297 Kan. 32, 33, 298 P.3d 293 (2013) (district judge has discretion to determine whether a comfort person may accompany a child witness). The judge granted both requests.

Fourteen days before Bowman's trial began, the judge held a competency hearing to determine if the child could testify at trial. By then the child was four years old. See *State v. Radke*, 168 Kan. 334, 340-41, 212 P.2d 296 (1949) (district judge may determine witness' capacity, meaning witness has capacity to understand oath and can "receiv[e] just impressions of the facts respecting which he is examined"; incompetent witness cannot testify). At the competency hearing, the child took the witness stand and responded appropriately to the oath, as modified for a child witness. Although the child initially showed hesitance that the district judge later labeled as "shyness," she answered questions that probed her ability to distinguish a true statement from a lie. She was not asked questions about the facts underlying the criminal charges. At the end of the hearing, the district judge found the child competent to testify.

When the trial began, the prosecutor's opening statement laid out the State's anticipated evidence against Bowman, including the substance of the child's pretrial statements to the detective in her forensic interview. This anticipated evidence included descriptions of specific sex acts.

4

The State then began its case by introducing evidence of how the child's allegations against Bowman came to light. This included an audiotape of a call to police and descriptions of out-of-court statements made by the child to her mother and grandmother. Bowman objected to this evidence, arguing that the district judge should not allow witnesses to testify about the child's statements until after the child had testified, that the statements were inadmissible hearsay, and that admitting the evidence would violate Bowman's constitutional right to confront witnesses against him. The judge overruled Bowman's objections under K.S.A. 60-460(a) (hearsay exception for "[a] statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness").

The State then called the child as a witness. The judge, jury, and the defendant watched by closed-circuit television in one courtroom while, in another courtroom, the State called the child to the stand and the court reporter tried to administer the oath required of all witnesses. See K.S.A. 22-3434 (establishing closed circuit procedure for certain child witnesses); K.S.A. 60-418 ("Every witness before testifying shall be required to express his or her purpose to testify by the oath or affirmation required by law."). Although the court reporter repeatedly asked the child to raise her hand, the child did not react. The court reporter then simply asked, "Do you promise to tell the truth today when you answer questions?" The child did not respond to the initial question or when the reporter repeated the question four times. At that point, Bowman's counsel asked for a bench conference.

The court reporter and counsel returned to the other courtroom where the jury and Bowman were and, at the bench, Bowman's counsel argued the witness was "being forced basically to say something that apparently she doesn't care to say. . . . She is not a competent witness to testify." The judge responded, "What the Court has seen is 30

5

seconds, maybe at most a minute, of counsel getting her up there to try and get her to take the oath. It is apparent to the Court that she is shy." Bowman's counsel expanded on his argument that the witness was being coerced and was not a competent witness, and the State responded. The judge found that the child was "shy in a very intimidating environment" and said he had not "heard anything that would give the Court [reason] to believe she is being coerced." The judge stated he would allow the State some leeway in trying to get the child to respond to the administration of the oath.

The attorneys and the court reporter returned to the courtroom where the child witness waited with her comfort person. Again, the reporter twice asked the child to raise her hand, but the child did not respond. The reporter then twice asked the child whether she promised to tell the truth. Again, the child did not respond.

Bowman again objected. Back in the courtroom where Bowman was present but the jury had been excused, the judge remarked that "the witness is not giving the Court any indication that she is going to take the oath." The judge then observed that the witness had to take the oath before she could testify and that the parties had "a hearsay issue with anything admitted prior." The judge asked the State how it wanted to proceed, and the State responded that it could not continue with the trial. Bowman's counsel then argued, "[I]f the State cannot produce the evidence consistent with hearsay and confrontation rules jeopardy has already attached and this case should be dismissed with prejudice." The State countered with a request for mistrial rather than dismissal with prejudice.

After additional argument, the judge ruled, "The child did not take the oath, therefore she is not competent to testify and she cannot provide testimony." The judge found the State would not be able to prove certain of the sex offense counts without the child's testimony, but the child's testimony was unnecessary to the State's prosecution of

6

intimidation counts. Still, the judge said, the jury had heard "inadmissible hearsay evidence regarding that child that would bleed over" to the intimidation counts. The judge therefore granted a mistrial on the entire case. The judge took under advisement whether any or all counts should be dismissed with prejudice and asked counsel to brief the issue. The judge then discharged the jury.

Within a few weeks, the district judge heard additional arguments on Bowman's motion to dismiss with prejudice on double jeopardy grounds. Defense counsel began his remarks, arguing that manifest necessity evaluated under strictest scrutiny was needed to justify a mistrial due to a failure of prosecution evidence. Had Bowman's trial continued, counsel asserted, either with an incompetent witness or without the child's testimony, Bowman would have been acquitted on the sex crime charges.

The judge raised the possibility of proceeding in another trial under K.S.A. 60-460(dd) if the child remained unavailable. See K.S.A. 60-460(dd) (allowing admission of child's pretrial statement in some cases, including if "the trial judge finds, after a hearing on the matter, that the child is disqualified or unavailable as a witness, the statement is apparently reliable and the child was not induced to make the statement falsely by use of threats or promises"). Bowman's counsel objected that admission of the child's out-of-court statements would nevertheless violate Bowman's constitutional right to confront the witness, and the judge observed that certain of the child's out-of-court statements might not qualify as testimonial and thus would be admissible. Bowman's counsel also argued that the State could have chosen to attempt admission of the child's pretrial statements under K.S.A. 60-460(dd) in the first trial, which would mean "there wouldn't have been manifest necessity for calling the closure to the proceedings." Counsel observed that the State had said it was in a "no-win" situation when the child refused to take the oath, but the "Constitution and this Court [are] not in the business of guaranteeing the State a win."

As the hearing continued, the judge said that Bowman's jury had been polluted by the prosecutor's opening statement as well as the hearsay evidence admitted, but defense counsel pointed out that the jury would have been told statements of counsel were not evidence and must be disregarded. When Bowman's counsel mentioned that the judge had granted the mistrial on the ground that the child witness was not competent to testify, the judge said that perhaps "unavailable" was a more accurate description of the child. The judge asked, apparently rhetorically, "Are we just using two different words to describe the same thing, a four year old who wouldn't take the oath, isn't that essentially what happened?"

This prompted defense counsel to argue that the "fragility" of the child witness had been foreseeable, given her initial reticence about testifying during the pretrial competency hearing. He closed his argument by again saying that the prosecution's reference to the trial as a "no win" demonstrated "a concession that they knew this would head to acquittal if the trial continued and acquittal would be an absolute bar to [a second trial]."

For her part, the prosecutor agreed that the strictest scrutiny should be applied to determine whether manifest necessity for the mistrial existed and a second trial was permitted. She characterized caselaw on mistrial and double jeopardy as "nuanced," allowing a second trial when there was a failure of critical State evidence unless there was misconduct or negligence on the part of prosecutors "in failing to recognize the risk of witness unavailability." She said that the district judge had had no alternative other than to declare mistrial in Bowman's case and said the child witness was unavailable because she froze on the witness stand, not that she was incompetent to testify. She described the jury as irreparably tainted, including on the intimidation counts, and said the trial could not have been fair to Bowman because of the content of her opening

statement. In her view, the strictest scrutiny test for manifest necessity was met by the circumstances in Bowman's case.

Defense counsel's brief response to the prosecutor's argument was limited to emphasizing that the reason the child did not take the oath and testify was legally irrelevant and not in evidence. He also said again that the defense had not sought a mistrial and would have been content to move forward with an admonition to the jury to disregard the admitted hearsay evidence and the prosecutor's opening statement regarding the child's out-of-court statements.

The district judge began his ruling by reviewing the proceedings to date. In doing so, he described the child's behavior at the competency hearing after her initial hesitation:

> "She was energetic, almost bubbly as far as just bounding in the chair, swiveling, I believe playing with the microphone, et cetera. She was very active. She was shy in that she was hesitant in the beginning and then ultimately opened up and answered questions regarding the difference between truth and a lie and the consequences thereof."

The judge distinguished the child's "normal four-year-old behavior" at the competency hearing from her demeanor at trial:

> "Her head was down, she was not moving, [and] she was not bouncing back and forth. . . . She didn't play with the microphone. She didn't crawl. She simply, as I recall, chin was down into her chest and she was looking down and unresponsive. She was frozen. I do not know why."

The judge then noted the State's pretrial motions practice and opening statement made it clear the State intended to rely on the child appearing and testifying at trial. The judge next explained that he had failed to turn off the microphone that transmitted sound

between the two courtrooms where Bowman and the jury sat during the bench conference when the lawyers and he discussed the child's first refusal to take the oath. This failure, he said, meant the child might have overheard the discussion, including defense counsel's argument that the court should not allow her testimony. At one point during this discussion, the child had left the witness stand.

Finally, the judge commented on the child's conduct after he allowed the court reporter to try to administer the child witness' oath again:

> "She was again chin down, looking downward focused, not responsive, not making any movement. She appeared frozen, not just shy. Much more so than at the prior hearing. To the extent that it readily became apparent that this child was not going to testify and that that was not a situation similar to the competency hearing [14] days prior where she had eventually opened up and was willing to discuss both with [the prosecutor] and with [Bowman's counsel] during cross-examination."

The judge said he had granted the mistrial over the defense's objection "based upon . . . what I saw as a witness who was not available or competent. I don't recall what word I used. But it was because she refused to take the child-friendly oath and refused to respond and I didn't see that changing in the foreseeable future."

The judge then said that most of the testimony heard by the jury before the child was called as a witness was "inadmissible evidence without her testimony being present." The judge rejected the possibility of admitting some of the child's statements under K.S.A. 60-460(dd), when the process of sorting admissible from inadmissible material would have needed to take place midtrial. The judge also said that a curative admonition to the jury to disregard the prosecutor's opening statement would have been ineffective. The child's forensic interview detailed in the prosecutor's opening statement "was highly

10

prejudicial in that circumstance as it related to oral sex, details of penetration of a three-year-old child."

The judge ultimately concluded that the mistrial was appropriately granted under two subsections of the mistrial statute—because it was "physically impossible to proceed with the trial in conformity with law" and because "[p]rejudicial conduct, in . . . the courtroom, [made] it impossible to proceed with the trial without injustice to either the defendant or the prosecution." See K.S.A. 22-3423(1)(a), (c). The "[p]rejudicial conduct in the courtroom" that the judge referred to was his failure to turn off the microphone, which may have permitted the child to overhear his bench conference with counsel; he did not cite the admission of inadmissible hearsay as "prejudicial conduct."

The judge then turned to the constitutional question of whether the standard of manifest necessity to permit a second trial had been met. The judge commented on his struggle with whether the mistrial was of an "essentially . . . unforeseen nature" given the "inherent risk in a four year old testifying even if this Court finds her competent ten minutes before she gets up on the stand and testifies because it is a four year old." The judge concluded he could "fairly say the State relied upon [the judge's pretrial competency ruling] in crafting its case," and he distinguished the circumstances before him from those in cases in which an adult witness refused to testify:  "This is a four-year-old child who froze." The judge concluded, "I considered alternatives . . . and I still see no way other than to discharge that jury." He reiterated that the statutory mistrial provisions of K.S.A. 22-3423(1)(a) and (1)(c) applied and held that manifest necessity under the strictest scrutiny supported granting the mistrial and allowing the case against Bowman to be tried a second time.

11

ANALYSIS

As we turn to our analysis of Bowman's request for a determination that the State not be allowed to twice place him in jeopardy on the criminal charges, we first consider whether we have jurisdiction. Bowman pursues relief under Kansas' habeas corpus statute, K.S.A. 2018 Supp. 60-1501. That statute allows an individual "who is detained, confined or restrained of liberty on any pretense whatsoever, . . . physically present in this state [to] prosecute a writ of habeas corpus in the supreme court, court of appeals or the district court of the county in which such restraint is taking place." K.S.A. 2018 Supp. 60-1501(a).

We have recognized that a writ of habeas corpus is "a proper remedy for challenging a trial court's pretrial denial of a claim of double jeopardy [because a] defendant would otherwise have no appellate forum in this state in which to assert a valid double jeopardy claim before being subjected to such jeopardy." *In re Habeas Corpus Petition of Mason*, 245 Kan. 111, 112-13, 775 P.2d 179 (1989). We therefore conclude we have jurisdiction over this proceeding under K.S.A. 2018 Supp. 60-1501.

Bowman has the burden of establishing his right to relief under this statute. See *Sammons v. Simmons*, 267 Kan. 155, 158, 976 P.2d 505 (1999).

Bowman relies on three sources of law to support his contention that a second trial would violate double jeopardy protections: the United States Constitution, the Kansas Constitution Bill of Rights, and Kansas statutes. But we need not decide today whether a second trial would violate the federal or state constitutions if we can resolve Bowman's case based on statutory interpretation. See *State v. Wetrich*, 307 Kan. 552, 558-59, 412 P.3d 984 (2018). "Appellate courts generally avoid making unnecessary constitutional decisions." *Wilson v. Sebelius*, 276 Kan. 87, 91, 72 P.3d 553 (2003); see *State ex rel.*

12

*Schmidt v. City of Wichita*, 303 Kan. 650, 658, 367 P.3d 282 (2016) ("Here, by first deciding the issue of compliance with statutory procedures, we eliminate the need to determine whether the proposed ordinance is constitutional.").

Bowman cited both the Kansas mistrial statute and the Kansas double jeopardy statute in his brief to this court. The State's brief relied exclusively on the mistrial statute to justify a second trial for Bowman, adhering to caselaw suggesting that the statutory bases for mistrial also serve as exceptions to a double jeopardy bar of a second prosecution. See *State v. Johnson*, 261 Kan. 496, 499, 932 P.2d 380 (1997) (mistrial, double jeopardy statutes provide complementary bases for second trial).

Like the constitutional arguments advanced by the parties, the question of the soundness of any such precedent need not be reached today if our interpretation of the plain language of the mistrial statute leads us to conclude that the district judge erred in declaring the mistrial. Even under the State's view of the governing law, an improperly declared mistrial does not permit a second trial that would conflict with the plain language of the double jeopardy statute.

*Mistrial Statute*

We begin our statutory interpretation with its most fundamental rule: Legislative intent governs. And the best avenue for discerning that intent is to read the language of the statute, giving common words their ordinary meaning. If the statute contains plain and unambiguous language, we do not look to extrinsic aids for guidance on legislative intent because the statutory language is "'the best and only safe rule for determining the intent of the creators of written law' . . . . [Citation omitted.]" *State v. Spencer Gifts*, 304 Kan. 755, 761, 374 P.3d 680 (2016). If, however, the statute's text is unclear or ambiguous, we turn to tools of statutory construction such as canons of construction and

13

legislative history to determine the Legislature's intent. *Ambrosier v. Brownback*, 304 Kan. 907, 911, 375 P.3d 1007 (2016).

We review a district judge's decision to grant a mistrial for abuse of discretion. *State v. Barlett*, 308 Kan. 78, 88, 418 P.3d 1253 (2018). Judicial discretion may be abused in three ways: by exercising discretion based on an error of law, an error of fact, or in an otherwise arbitrary, fanciful, or unreasonable manner. *State v. Gonzalez-Sandoval*, 309 Kan. 113, 126-27, 431 P.3d 850 (2018).

Kansas' mistrial statute reads:

"(1) The trial court may terminate the trial and order a mistrial at any time that [it] finds termination is necessary because:

(a) It is physically impossible to proceed with the trial in conformity with law; or

(b) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law and the defendant requests or consents to the declaration of a mistrial; or

(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution.

. . . .

"(2) When a mistrial is ordered, the court shall direct that the case be retained on the docket for trial or such other proceedings as may be proper and that the defendant be held in custody pending such further proceedings, unless he is released pursuant to the terms of an appearance bond." K.S.A. 22-3423.

Again, the district judge relied on subsections (1)(a) and (1)(c) in granting the State's motion for mistrial in this case.

As to subsection (1)(a), the State agreed with defense counsel at oral argument before this court that the child's refusal to take the oath and testify did not make it "physically impossible" to continue Bowman's trial. This was a sensible, and wise, concession. Giving the common words in the phrase "physically impossible" their ordinary meaning, failure of even a critical portion of the State's proof because of a recalcitrant witness of any age and for any reason does not make trial a physical impossibility. See Webster's New World College Dictionary 1101 (5th ed. 2014) ("physical" defined as "1 of nature and all matter; natural; material . . . 5 *a)* of the body as opposed to the mind"); Webster's New World College Dictionary 731 (5th ed. 2014) ("impossible" defined as "not capable of being, being done, or happening"). The child's refusal to take the oath certainly made it more difficult for the State to obtain a conviction on the rape and sodomy counts in the same way it is harder for any lawyer to obtain a desired result when evidence heralded in earlier testimony or the lawyer's own opening statement fails to materialize.

In addition, the circumstances of Bowman's case also did not meet the subsection (1)(a) requirement that any continuation of the trial would not be in conformity with the law. Although the judge was correct that the child's inability to testify meant that at least some of the testimony he had admitted earlier over defense counsel's objection could not be considered by the jury on any count, jurors could have been instructed to disregard it. See *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016) (any prejudice from hearsay statements admitted before declarant refused to testify removed by curative instruction to jury to disregard hearsay testimony). And jurors, as defense counsel observed, are routinely instructed that the statements of counsel, such as those in the prosecutor's opening, are not evidence in and of themselves. See PIK Crim. 4th 50.070 (statements,

15

arguments, remarks of counsel not evidence). This means that it was within the judge's power to neutralize the ill effects to either party from the collapse of the prosecutor's trial strategy; it is commonplace for us, as appellate judges, to assume jurors follow such instructions, including those designed to cure problems that arise during trial. *Logsdon*, 304 Kan. at 39 (jury presumed to follow court's curative instruction); *State v. Williams*, 299 Kan. 509, 548, 324 P.3d 1078 (2014).

We conclude that the plain language of subsection (1)(a) of the mistrial statute could not support the mistrial declared in this case. The district judge abused his discretion in ruling otherwise because he based that ruling on an erroneous interpretation of the law.

On subsection (1)(c), we again start with plain language. That language permitted a mistrial only in the event that "[p]rejudicial conduct, in or outside the courtroom, [made] it impossible to proceed with the trial without injustice to either the defendant or the prosecution." In the State's brief and later, at oral argument, the prosecutor agreed with our reading of the record: The district judge regarded his neglect to turn off the microphone enabling audio transmission from courtroom to courtroom as the "[p]rejudicial conduct in . . . the courtroom" that justified the mistrial declaration under subsection (1)(c).

The first problem with this argument is that the district judge's expressed concern, on the record before us, qualifies as mere conjecture. No sworn testimony or other evidence exists to demonstrate that the child heard or understood any of what was said during the bench conference or that whatever she heard or understood caused her to leave the witness stand or rebuff the court reporter's second series of efforts to administer the oath.

16

The second problem is that, even if we assume that the child accidentally overheard the bench conference and did understand counsel's arguments to be prompted by her behavior and, as a result, refused again to take the oath, the State faces the same difficulty in relying on subsection (1)(c) that it faced in relying on subsection (1)(a). It simply was not "impossible," as that common word is ordinarily understood, to proceed with the trial "without injustice to either the defendant or the prosecution."

Continuing the trial would not have led to injustice to Bowman. We must remember that Bowman opposed the mistrial; he wanted to continue and take his chances on the proof the State was ultimately able to muster. Rather than starting over with a new jury, Bowman wanted the judge to attempt to cure any prejudice arising from the earlier admission of hearsay testimony and the prosecutor's opening statement. Had the judge made reasonable efforts along those lines, and Bowman been convicted, the defense could not have complained successfully on appeal that the hearsay or opening statement were so harmful that Bowman deserved a reversal. Bowman and his counsel would have invited any error in failing to grant a mistrial. They would be stuck with the consequences of the risk they embraced.

Likewise, the State embraced risk in this case when the prosecutor chose to build her sex crime case around live trial testimony from a very young witness who might or might not be able to follow through on her pretrial promise. The consequences were harsh but not unforeseeable. Regardless of whether the child witness in this case was found to be competent to testify approximately two weeks before the trial, as the district judge acknowledged, a four year old is unpredictable. Common sense dictated that the prosecutor exercise caution.

Indeed, precedent from this court has warned about exactly what ultimately happened in Bowman's trial—a hearsay declarant's failure to back up earlier witnesses

who have already discussed the declarant's out-of-court statements. This is why we have suggested that the better practice is for counsel to order witness testimony so that the hearsay declarant takes the stand first. See *State v. Davis*, 236 Kan. 538, 541, 694 P.2d 418 (1985) ("While it may be better practice . . . to call the declarants prior to the admission of their out-of-court statements by other witnesses, the failure to do so when the declarants are available and actually testify does not violate the confrontation clause."). For whatever reason, despite a contrary example in a child sex crime prosecution with a child victim from her own county, see *State v. Miller*, 293 Kan. 535, 540, 264 P.3d 461 (2011), the prosecutor in this case decided to do the opposite. Accepting that she did so in "utmost good faith," as she asserted at oral argument, we still cannot excuse her from the consequences of the risk she took or from the district judge's doubling down on that risk when he overruled defense objections to the hearsay testimony. The prosecutor's choice and the district judge's ruling on the defense objections were at the root of the predicament in which all parties found themselves when the child would not take the oath. "Injustice" to the prosecution does not arise when a result follows from the risky but voluntary trial strategy choices of its counsel.

The plain language of subsection (1)(c) of the mistrial statute could not support the mistrial declared in this case. Again, the district judge abused his discretion in ruling otherwise because he based that ruling on an erroneous interpretation of the law.

*Double Jeopardy Statute*

In its brief, as stated above, the State argued only the applicability of the mistrial statute, without addressing the applicability of the double jeopardy statute. The district judge also relied only upon the mistrial statute. At oral argument, the prosecutor realized, as this court has, that we must also contend with the effects of the double jeopardy statute cited in Bowman's brief.

18

That statute, K.S.A. 2018 Supp. 21-5110, prohibits a second trial if a defendant has been "formerly prosecuted for the same crime, based upon the same facts," and a specific set of circumstances enumerated in the statute exists. Bowman argues that the set of circumstances set out in subsection (a)(3) of the statute fits his case. It applies if the former prosecution

> "(3) was terminated without the consent of the defendant after the defendant had been placed in jeopardy, except where such termination shall have occurred by reason of:
>
> (A) The illness or death of an indispensable party;
>
> (B) the inability of the jury to agree; or
>
> (C) the impossibility of the jury arriving at a verdict." K.S.A. 2018 Supp. 21-5110(a).

The State acknowledges, as it must, that Bowman opposed the mistrial and immediately and continuously sought a dismissal with prejudice. It is equally clear that jeopardy attached in the first proceeding under K.S.A. 2018 Supp. 21-5110(f), which reads: "A defendant is in jeopardy when such defendant is put on trial in a court of competent jurisdiction upon an indictment, information or complaint sufficient in form and substance to sustain a conviction, and in the case of trial by jury, when the jury has been impaneled and sworn." See *Mason*, 245 Kan. at 114; see also *Martinez v. Illinois*, 572 U.S. 833, 839-40, 134 S. Ct. 2070, 188 L. Ed. 2d 1112 (2014).

The State's only argument under the double jeopardy statute is that application of the third exception to the double jeopardy bar to a second trial laid out in K.S.A. 2018 Supp. 21-5110(a)(3)(C) is coextensive with application of K.S.A. 22-3423(1)(a) and

19

(1)(c) of the mistrial statute. In short, the State believes that the district judge correctly applied the two subsections of the mistrial statute; thus the district judge must have correctly applied K.S.A. 2018 Supp. 21-5110(a)(3)(C) of the double jeopardy statute as well. The State relies on the appearance of the word "impossible" in all three provisions.

The first and most obvious reason that this argument is unavailing is that, as established above, the plain language of the two subsections of the mistrial statute on which the State attempts to rely is inapplicable in this case. The mistrial declared here was improper.

The second reason the State cannot rely successfully on (a)(3)(C) is that its plain language requires that it be impossible for the jury to arrive at a verdict. Giving the common words "impossible" and "verdict" their ordinary meaning, the child's refusal to take the oath did not inevitably and irrevocably prevent the jury from deciding the question of his guilt. "[A] verdict" is not synonymous with "a conviction"; an acquittal also qualifies as a verdict. See Black's Law Dictionary 28 (10th ed. 2014) ("acquittal" is "legal certification, usu. by jury verdict, that an accused person is not guilty of the charged offense"). The State's argument essentially ignores this reality.

CONCLUSION

The plain language of K.S.A. 22-3423 does not permit a mistrial to be declared over a defendant's objection when the prosecutor chooses to open the State's case with hearsay evidence; a proper defense objection to that evidence is overruled; and anticipated testimony from a child hearsay declarant fails to materialize because the child refuses to take the oath when called to the witness stand.

20

The plain language of the Kansas double jeopardy statute, K.S.A. 2018 Supp. 21-5110(a)(3), bars a second trial when (1) the State formerly prosecuted a defendant for the same crime, based on the same facts; (2) the previous prosecution was terminated without the consent of the defendant after having been placed in jeopardy; and (3) no exception listed in the statute applies. An improperly declared mistrial under K.S.A. 22-3423 is not one of the exceptions in the double jeopardy statute; thus it does not permit a second trial.

In this case, Bowman has successfully established that the district judge improperly declared a mistrial and that no exception to the statutory bar to a second trial applies. We therefore grant the petition for writ of habeas corpus. Bowman's criminal case is dismissed, and Bowman must be released from any confinement arising out of it.

* * *

LUCKERT, J., dissenting: I disagree with the majority's conclusion that the trial judge presiding over Rictor Bowman's first prosecution abused his discretion when he declared a mistrial. The judge terminated the proceedings on all counts because comments made by the prosecutor during opening statements caused a level of prejudice that made a fair and impartial verdict impossible. The trial judge, in the exercise of his discretion, assessed the circumstances, evaluated the prejudice, considered alternatives to a mistrial, and made the considered judgment that the parties would not have a full and fair opportunity to present their evidence to an impartial jury. In doing so, the trial judge made no error of law or fact, and his assessment was not arbitrary, fanciful, or unreasonable. In other words, he did not abuse his discretion. The majority, in reaching the holding that the trial judge erred, focuses on the unavailability of the child witness. While the child's unavailability set off a chain of circumstances that made the prosecutor's statement prejudicial, the trial judge did not declare the mistrial because the

21

child failed to take the witness' oath. The majority has thus shifted the focus from the trial judge's ruling, and this shift skews its analysis.

I also disagree with the majority's conclusion that a second prosecution is barred by K.S.A. 2018 Supp. 21-5110, which protects against being placed in double jeopardy. The statute provides exceptions, and the trial judge's determination that the jury could not reach a fair and impartial verdict meets the exception in K.S.A. 2018 Supp. 21-5110(a)(3)(C). Thus, the statute does not bar a second prosecution.

Finally, because I reach those conclusions, I must consider an issue the majority did not have to address: Would a second prosecution violate the double jeopardy protections in either the United States or the Kansas Constitutions? Because the mistrial was a manifest necessity, I conclude neither constitution prohibits a second trial. I would thus deny Bowman's request for a writ of habeas corpus.

1.     *The trial judge did not abuse his discretion in granting a mistrial.*

After the child had been called to the witness stand but did not take the witness' oath, the judge made a series of findings. As relevant to the reasons for the mistrial, during remarks at trial and the later hearing, the trial judge found:

- The child was "shy in a very intimidating environment," Bowman's objection to the witness competence (made after long argument) was overruled, and the court reporter was allowed to continue to ask the child to take the oath;
- The microphone had been inadvertently left on during those arguments about the child's competency;

22

- It was apparent after additional attempts to administer the oath that the witness was "frozen" and "not giving the Court any indication that she [was] going to take the oath";
- The witness was "not competent to testify and she cannot provide testimony" because she failed to take the oath;
- The child's testimony was unnecessary to the State's prosecution of some counts;
- The prosecutor's opening statement had included details about Bowman's alleged conduct as revealed by the child during a forensic interview that would not be admissible without the child's testimony;
- The State's opening statement "was highly prejudicial in that circumstance as it related to oral sex, details of penetration of a three-year-old child and the Court does not view a curative instruction as being effective in that circumstance" because the prejudice would "bleed over" to all counts.

The trial judge then ruled a mistrial was necessary under K.S.A. 22-3423(1)(a) and (c), which provide:

"(1) The trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because:

(a) It is physically impossible to proceed with the trial in conformity with law; or

. . . .

(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

23

I agree with the majority that the facts here do not present circumstances that made it physically impossible to proceed with a trial. But I disagree with the holding that subsection (c) does not apply.

To determine if a mistrial provision applies, a trial judge follows a two-step analysis. First, the trial judge must determine if there was a fundamental failure in the proceeding. Second, the judge must consider whether the failure will necessarily result in an injustice or whether the judge can cure or mitigate it through a jury admonition or by another method. The trial judge has wide discretion at each step. Judicial discretion is abused if judicial action (1) is based on an error of law, (2) is based on an error of fact, or (3) is arbitrary, fanciful, or unreasonable. See *State v. Ward*, 292 Kan. 541, 550-51, 256 P.3d 801 (2011).

As to the first step, a failure occurred in Bowman's trial. The prosecutor told the jury about information that ultimately did not come into evidence. This failure is not uncommon. On occasion, evidence at trial will not match an attorney's representations during opening statements about what he or she expects to prove. Judges thus routinely instruct jurors that "[s]tatements, arguments, and remarks of counsel . . . are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." PIK Crim. 4th 50.070. At times, however, the discrepancy is so prejudicial the error becomes a fundamental failure that necessarily must lead to a mistrial. Such a circumstance arose in *Arizona v. Washington*, 434 U.S. 497, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978), one of the leading decisions of the United States Supreme Court discussing the implications of a mistrial on a defendant's constitutional protection against double jeopardy.

In *Washington*, the trial judge granted a mistrial in a second prosecution after defense counsel, during his opening statement, informed the jury the first trial ended in a

24

mistrial because the prosecutor had withheld potentially exculpatory information. The prosecutor moved for a mistrial, but the judge denied the motion, pointing out he had not yet ruled on whether he would admit into evidence the reasons for the first mistrial. The prosecutor renewed the motion the following morning. This time the trial judge ruled on the evidentiary question and granted the mistrial motion. The United States Supreme Court accepted the state court trial and appellate court determinations that defense counsel had erred. The Supreme Court then held the mistrial was a manifest necessity. 434 U.S. at 511-13.

Many cases from this court likewise establish that error—a fundamental failure—may occur when an attorney tells the jury about facts that are not and will not be admitted into evidence. And this error can arise from statements made at any point from voir dire to closing argument. See, e.g., *State v. Simmons*, 292 Kan. 406, 412-15, 254 P.3d 97 (2011) (discussing rules of ethics prohibiting attorneys from telling jury about evidence that is not or will not be in evidence and cases finding that doing so is error).

Here, in determining if a fundamental failure occurred because of the prejudicial nature of the child's allegations of rape and oral sex that would not be supported by evidence, the trial judge made no error of law or fact. And reasonable people could agree with this determination. In sum, the trial judge did not abuse his discretion by finding a fundamental failure had occurred.

At the second step of a mistrial analysis, the trial judge must assess whether the failure in the proceeding will necessarily result in an injustice or whether the judge can cure or mitigate it through a jury admonition or another method. As noted above, trial judges routinely instruct juries to disregard statements of counsel that are unsupported by evidence. And, as the majority points out, this court generally presumes a jury will follow an admonition or instruction. But we have qualified that rule. In *State v. Angelo*, 287 Kan.

25

262, 285, 197 P.3d 337 (2008), for example, we stated: "[W]here the trial court sustains an objection and admonishes the jury to disregard the objectionable testimony, reversal is not required *unless the remarks are so prejudicial as to be incurable*." (Emphasis added.) This court has even instructed that "[w]hen an event of prejudicial misconduct, the damaging effect of which cannot be removed by admonition and instruction, is presented to the jury, the trial judge *must* declare a mistrial." (Emphasis added.) *State v. Lewis*, 238 Kan. 94, 97, 708 P.2d 196 (1985). The *Lewis* case presented just such a situation. "Neither admonition nor instruction by the trial judge could insure that the defendants would receive a fair trial." 238 Kan. at 99.

The United States Supreme Court reached a similar conclusion in *Washington*. It held the trial judge's determination that such an instruction would not cure the prejudice should not be second guessed. The Supreme Court stated:

> "We recognize that the extent of the possible bias cannot be measured, and that the District Court was quite correct in believing that some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, the mistrial was not 'necessary.' Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Washington*, 434 U.S. at 511.

This court likewise grants broad discretion to a trial judge making the assessment of prejudice. See *Ward*, 292 Kan. at 550. The situation in Bowman's trial was one where the trial judge was in the best situation to assess the impact on the jury.

The majority applies a different rule because, in part, continuing with the trial was not an absolute impossibility. See K.S.A. 22-3423(1)(c) (allowing a mistrial if "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with

26

the trial without injustice to either the defendant or the prosecution."). But impossibility in this context does not mean absolute impossibility. Webster's New World College Dictionary 731 (5th ed. 2014) defines "impossibility" as "the fact or quality of being impossible." In turn, it defines "impossible" as one of three alternatives: "not capable of being, being done, or happening"; "not capable of being done easily or conveniently"; "not capable of being endured, used, agreed to, etc. because disagreeable or unsuitable." These definitions suggest "impossibility" does not mean something absolutely cannot be done. Instead, impossible can mean something cannot be done easily or conveniently or cannot happen in a suitable manner.

Caselaw and commentary document that the Legislature intended courts to use a test of suitability—phrased in terms of suitable for achieving a fair and impartial verdict—when applying K.S.A. 22-3423(1)(c). This court's statements in *Angelo* and *Lewis* suggest as much. Also, around the time the Kansas Legislature enacted K.S.A. 22-3423 and the mistrial statute—both of which refer to the "impossibility" of a verdict—Washburn University School of Law Professor Raymond Spring wrote that the Legislature intended to codify caselaw. Spring, *The Effect of Former Prosecutions: Something Old and Something New Under Kan. Stat. Ann. Sec. 21-3108*, 9 Washburn L.J. 179, 180 (1970). As to the use of the word "impossibility," he explained:

> "The impossibility of the jury arriving at a verdict would seem to encompass the various circumstances which could occur during trial which would render it physically impossible to continue with the trial (such as the destruction of the courthouse by a tornado in the midst of the trial) or legally impossible for the jury to render a viable verdict (such as belated discovery that a juror is disqualified)." 9 Washburn L.J. at 189.

Spring cited *State v. Hansford*, 76 Kan. 678, 92 P. 551 (1907), *overruled on other grounds as stated in State v. Foster*, 290 Kan. 696, 718, 233 P.3d 265 (2010), as support

27

for the interpretation that an impossibility of the jury arriving at a verdict includes legal impossibilities.

In *Hansford*, a juror asked the judge to excuse him after the judge had sworn the jury and heard some testimony. The juror felt he could not be impartial because his family had experienced a crime much like the one at issue in the trial. The *Hansford* court held a mistrial was a necessity because a fair and impartial verdict was an impossibility:

> "When a juror, as in this case, confesses to an incurable prejudice which disqualifies him from exercising the functions of a juror or acting impartially as between the parties a continuance of the trial would be a farce, as the object of a trial—a fair and impartial verdict—becomes an impossibility. After learning of this situation by a judicial inquiry nothing was left for the court except to discharge that jury and impanel another." 76 Kan. at 682-83.

Likewise, in *State v. Gray*, 189 Kan. 398, 369 P.2d 330 (1962), a juror advised the trial judge he felt he could not render a fair and impartial verdict. The *Gray* court quoted *Hansford* and recognized the authority of trial courts to declare a mistrial and order a second trial without violating the double jeopardy doctrine:

> "'"[C]ourts of justice are invested with the authority to discharge a jury from giving any verdict whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and a defendant is not thereby twice put in jeopardy.'" [Citation omitted.]" 189 Kan. at 400.

The *Gray* court explained a trial judge can exercise discretion to declare a mistrial when "there is a real, absolute, and unequivocal necessity for discharge of a jury in order that the ends of justice will not be defeated." 189 Kan. at 401. The *Gray* court found no abuse of discretion when the trial court found a mistrial necessary because neither the

defendant nor the State could receive a fair trial. 189 Kan. at 401. A similar analysis was applied in *State v. Howard*, 221 Kan. 51, 55-57, 557 P.2d 1280 (1976). And, as previously noted, in the more recent case of *Lewis*, this court directed trial judges to declare a mistrial when an admonition would not cure prejudice caused by a trial error. See 238 Kan. at 97.

Thus, Kansas' caselaw agrees with *Washington*. To paraphrase, the word "impossible" is not to be read in the strict, literal sense. Instead, courts apply it in the legal sense of whether it is possible to achieve a fair and impartial verdict. And appellate courts "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Washington*, 434 U.S. at 511.

The majority refused to give deference to the trial judge's assessment, however, because Bowman had objected to the mistrial. In essence, the majority concludes the defendant's objection suspends a trial judge's duty to assure a defendant receives a fair trial. In my view, the objection does not determine whether a mistrial is necessary, although it is important in the analysis of which provisions in the Kansas double jeopardy statute apply. See K.S.A. 2018 Supp. 21-5110.

The reason the objection is not determinative rests in the public's interest in a fair trial. As the United States Supreme Court held in *Washington*, a defendant's "valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Washington*, 434 U.S. at 505. The Court elaborated on this conclusion:

> "An improper opening statement unquestionably tends to frustrate the public
> interest in having a just judgment reached by an impartial tribunal. Indeed, such

29

statements create a risk, often not present in the individual juror bias situation, that the entire panel may be tainted. The trial judge, of course, may instruct the jury to disregard the improper comment. In extreme cases, he may discipline counsel, or even remove him from the trial as he did in *United States v. Dinitz*, 424 U.S. 600[, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976)]. Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument. Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases." *Washington*, 434 U.S. at 512-13.

Here, there is no suggestion defense counsel acted unscrupulously. The roles were flipped from *Washington*, and here it was the prosecutor who made the prejudicial argument. In objecting, Bowman's counsel was seeking to protect Bowman's rights. But neither did the prosecutor act unscrupulously when she disclosed information that would not be admitted at trial—the same action as committed by defense counsel in *Washington*. The trial judge made extensive findings and concluded the prosecutor had acted in good faith. The motivation and the actor do not matter, however. Ultimately, the rights of the defendant do not trump the public interest in a fair trial.

Still, the majority concludes the public interest was essentially forfeited because the prosecutor took a risk in proceeding as if the child would testify. Yet the prosecutor acted in a manner consistent with Kansas law. K.S.A. 60-460(a) provides: "A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness." In addition, this court has not required litigants to call the declarant before introducing hearsay about the declarant's out-of-court statements. See *State v. Davis*, 236 Kan. 538, 541, 694 P.2d 418 (1985). We should not now hold the prosecutor to a different rule.

The witness also had repeatedly revealed a willingness to testify. Shortly before trial, she testified in the courtroom during the competency hearing. While at first shy, she answered questions. The judge had also watched the video of the child's forensic interview. There, she had again seemed shy, but she had provided detailed information. The judge discussed these points at considerable length, describing the child's demeanor in the various situations. The trial judge also concluded the prosecutor had acted reasonably and in good faith. Indeed, the prosecutor took steps to prevent the situation that unfolded by using the closed circuit procedure and allowing a comfort person to sit with the child while she testified.

The State, in assessing the risk, knew how the child had reacted to being interviewed and to being on the witness stand. And the State knew the steps taken to create an environment that would make the child more comfortable. This knowledge reasonably led the State to present its case based on the child testifying. But the inadvertent failure to turn off the microphone nullified all these steps. The risk assessment changed significantly. We should not play Monday morning quarterback by second-guessing that assessment.

That said, the majority makes a valid point that *we* do not know the full extent of the prejudice caused by leaving the microphone on because *we* cannot know how or if the arguments affected the child. Indeed, there is no direct evidence the child heard the exchange or was influenced by it. But direct evidence is unnecessary because plenty of circumstantial evidence exists. See *State v. Lowery*, 308 Kan. 1183, Syl. ¶ 13, 427 P.3d 865 (2018) (holding "there is no distinction between direct and circumstantial evidence in terms of probative value"). And the circumstantial evidence gave the *trial judge* the ability to make the assessment that *we* cannot make on a cold record.

The trial judge could observe the child during the arguments. Near the end of the exchange between the attorneys and the judge, the prosecutor commented, "We have a witness on the loose." And defense counsel stated, "[S]he's left the witness stand." Later, the trial judge also detailed his observations of the child's demeanor. Before the arguments, he observed a child he described as "shy." After the arguments, he described the child as "frozen." Significantly, at the pretrial hearing on the State's motion to use the closed circuit procedure allowed by K.S.A. 22-3434, he cited to the testimony of the child's therapist and concluded there was a substantial risk she would "essentially shut down" or "not open up" if she felt threatened. Circumstantial evidence exists to support the conclusion that is what happened when Bowman's counsel argued she should not be allowed to testify.

Granted, the trial judge's findings about the effect of the open microphone on the child are somewhat vague. Even so, they sufficiently convey the change in the child's demeanor and the judge's finding that prejudicial conduct occurred in the courtroom when he inadvertently failed to turn off the microphone. In my view, the trial judge's findings and the evidence supporting those findings are sufficient. And the trial judge is in the best position to evaluate the incident, to recognize the chain of circumstances it triggered that led to the fundamental failure in the proceedings, and to assess the extent of prejudice that fundamental failure caused.

Ultimately, the focus must be on the trial judge's assessment that the prosecutor's statements prejudiced the jury to the point no admonition would provide a cure. I give full weight to that assessment. As the United States Supreme Court explained in *Washington*:

> "There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has

32

seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more 'conversant with the factors relevant to the determination' than any reviewing court can possibly be." *Washington*, 434 U.S. 513-14.

I thus conclude the judge did not abuse his discretion in granting the mistrial under K.S.A. 22-3423(1)(c).

2. *K.S.A. 2018 Supp. 21-5110 does not bar a retrial.*

I also disagree with the majority's holding that K.S.A. 2018 Supp. 21-5110 protects Bowman from a second prosecution. Subsection (a)(3) governs whether a second prosecution is statutorily permissible. It applies if the former prosecution

"(3) was terminated without the consent of the defendant after the defendant had been placed in jeopardy, except where such termination shall have occurred by reason of:

(A) The illness or death of an indispensable party;

(B) the inability of the jury to agree; or

(C) the impossibility of the jury arriving at a verdict." K.S.A. 2018 Supp. 21-5110(a).

The majority holds this provision does not apply because it was possible for Bowman's first jury to have found him either guilty or to have acquitted him. Certainly, this is a reality. But more is at stake than the ability to reach a verdict. If it were not, K.S.A. 22-3423(1)(c), which allows a mistrial when "[p]rejudicial conduct . . . makes it impossible to proceed with the trial without injustice," would be meaningless as a

practical matter. Such an interpretation is contrary to our rules of statutory interpretation. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 570, 232 P.3d 856 (2010) ("We presume that the legislature does not intend to enact meaningless legislation."). As I have discussed, I read our caselaw to make clear that judges applying the concept of "impossibility," as expressed in the mistrial statute and K.S.A. 2018 Supp. 21-5110(a)(3)(C), must consider whether the jury could reach a fair and impartial verdict.

Nothing in the language of K.S.A. 2018 Supp. 21-5110 mandates a different conclusion. The Legislature first adopted an exception for the most obvious situation in which a verdict is impossible: where the jury cannot agree on the verdict. See K.S.A. 2018 Supp. 21-5110(a)(3)(B). So we know that the impossibility referred to in (a)(3)(C) must mean something other than this. See *Powell*, 290 Kan. at 570. But what exactly the Legislature meant is difficult to discern. The legislative record provides little insight because the wording of the statute was introduced as an amendment in committee and the record does not explain why. Minutes, Senate Judiciary Committee, February 10, 1969.

Still, I find some guidance in the contemporaneous record of Professor Spring's article. As I have noted before, he reported that the Legislature intended for the new statute to codify caselaw. See Spring, 9 Washburn L.J. at 180. That caselaw suggests that the Legislature intended to convey the impossibility of reaching a fair and impartial verdict, not the absolute impossibility standard the majority imposes. See *Howard*, 221 Kan. at 55-57; *Gray*, 189 Kan. at 399-401; *Hansford*, 76 Kan. at 682-83.

Consistent with the Kansas Legislature's intent and the caselaw of this and other courts, this court in *State v. Johnson*, 261 Kan. 496, 499, 506, 932 P.2d 380 (1997), held the mistrial and double jeopardy statutes complement each other: "K.S.A. 22-3423 also lists exceptions to double jeopardy protection." The *Johnson* court recognized the judge's duty to conduct a fair trial may create a manifest necessity of a mistrial and, under those

circumstances, a later prosecution would not violate Kansas' double jeopardy statute. 261 Kan. at 500; see K.S.A. 22-3423(1)(c) (allowing mistrial when "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution").

Under *Johnson* and the other cases, because the trial judge appropriately determined the jury could not reach a fair and impartial verdict and a mistrial was appropriate, K.S.A. 2018 Supp. 21-5110 does not act as a bar to a second prosecution of Bowman.

3. *Constitutional double jeopardy protections do not prevent a retrial.*

The remaining question is the one primarily argued by Bowman: Even if the mistrial was appropriate and a second prosecution was not statutorily barred, do the United States and Kansas Constitution Bill of Rights allow a second trial? I conclude they do.

The Double Jeopardy Clause in the Fifth Amendment to the United States Constitution provides: "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." The Fourteenth Amendment to the United States Constitution makes this prohibition applicable to the states. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). The Kansas Constitution Bill of Rights § 10 also provides: "No person shall . . . be twice put in jeopardy for the same offense." We have recognized this right to be coextensive with the protections of the Fifth Amendment to the United States Constitution. See *State v. Morton*, 283 Kan. 464, 467, 153 P.3d 532 (2007); see also *State v. Miller*, 293 Kan. 535, 544, 264 P.3d 461 (2011). As a result, my analysis under the United States Constitution applies with equal force to Bowman's double jeopardy challenge raised under the Kansas Constitution Bill of Rights.

35

Under the Double Jeopardy Clause of the United States Constitution, jeopardy attaches in a jury trial when the court administers the oath to the jurors. The swearing of the jury is a bright line for when jeopardy attaches. *Martinez v. Illinois*, 572 U.S. 833, 839-40, 134 S. Ct. 2070, 188 L. Ed. 2d 1112 (2014).

If jeopardy has attached, the next question is whether jeopardy ended in a way that allows the State to retry a defendant. *Martinez*, 572 U.S. at 841 (citing 6 LaFave, Criminal Procedure § 25.1[g] [3d ed. 2007]). The "fountainhead" case establishing the standard courts apply when answering this question is *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L. Ed. 165 (1824). See *Illinois v. Somerville*, 410 U.S. 458, 461, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973).

The *Perez* Court considered whether the government could retry Josef Perez for a capital offense after the first jury could not agree on a verdict. Justice Story writing for the Court explained defendants may be subject to a second trial if a manifest necessity prompted the declaration of a mistrial to avoid a defeat of "the ends of justice":

> "We are of [the] opinion, that the facts constitute no legal bar to a future trial. The prisoner has not been convicted or acquitted, and may again be put upon his defence. We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a *manifest necessity* for the act, or the *ends of public justice* would otherwise be defeated. They are to *exercise a sound discretion* on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and

36

conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." (Emphases added.) 22 U.S. (9 Wheat.) at 580.

Defining the contours of "manifest necessity" and the "ends of public justice" has led to several cases. Over time, "manifest necessity" has become the focus of the inquiry. See 6 La Fave, Criminal Procedure § 25.2(c) (4th ed. 2015).

The United States Supreme Court elaborated on "manifest necessity" in *Washington*, 434 U.S. 497. As I have discussed, there, like here, counsel made statements during opening arguments about inadmissible evidence. The judge found the comments so prejudicial, he granted a mistrial. The Court upheld the mistrial determination but explained that holding did not answer whether the defendant was subject to another prosecution.

The *Washington* Court took steps to balance a defendant's right to have the trial completed by the empaneled jury with the public interest of a fair and impartial verdict by holding that a prosecutor bears the heavy burden of establishing that manifest necessity supports a mistrial declared over a defendant's objection. Manifest necessity is a fact-specific standard that cannot be applied mechanically. And "it is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." 434 U.S. at 506.

The Court identified a sliding scale of scrutiny to be applied by an appellate court reviewing a trial judge's mistrial declaration. See *Colvin v. Sheets*, 598 F.3d 242, 253 (6th Cir. 2010). The lowest level of scrutiny applies when a trial judge declares a mistrial based on his or her belief the jury cannot reach a legal verdict. See *Washington*, 434 U.S.

at 506-09. The highest level or "strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." 434 U.S. at 508 (citing *Downum v. United States*, 372 U.S. 734, 83 S. Ct. 1033, 10 L. Ed. 2d 100 [1963]). The Court determined the issue leading to the mistrial in George Washington, Jr.'s, trial fell "along the spectrum of trial problems . . . in an area where the trial judge's determination is entitled to special respect." 434 U.S. at 510. The Court deferred to the trial court's assessment of bias and reversed the lower federal courts that had found the trial judge's declaration of mistrial constitutionally flawed. 434 U.S. at 516-17.

In my view, *Washington* resolves the double jeopardy issue here. Bowman's trial, like Washington's, ended in a mistrial because of prejudicial comments in the opening statement about evidence that would not be admissible at trial. The trial judge's assessment that these statements were so prejudicial that the jury could not reach a fair and impartial verdict is entitled to special respect. The mistrial was a manifest necessity and a subsequent prosecution is not constitutionally prohibited.

Bowman, however, seizes on *Washington* to support his argument that the strictest scrutiny should apply here. He does so because of the *Washington* Court's recognition that the strictest scrutiny applies when "the basis for the mistrial is the unavailability of critical prosecution evidence." 434 U.S. at 508. Bowman, like the majority, focuses on the child not testifying as the reason for the mistrial. And certainly the child's unavailability caused the chain reaction that led the trial judge to view the prosecutor's comments as prejudicial. Perhaps because of this, the trial judge used a strict scrutiny standard in determining a second prosecution would not violate constitutional double jeopardy protections. I also recognize some ambiguity about whether two levels of consideration apply here—one to the counts that did not depend on the child's testimony

38

and the other to those that did. No one has discussed this possibility, and I have found little guidance. It also is not clear that the strictest level of scrutiny applies in every case in which a witness is unavailable. But the caselaw of other courts provides some guidance, and the trial judge's conclusions are consistent with the various factors considered by those courts.

In citing the strict scrutiny standard, the *Washington* Court merely characterized the holding in *Downum*. The facts of Bowman's first trial differ in kind from those in *Downum*, where, before the court empaneled the jury, the State knew one witness was not present and had not yet been located. The *Downum* Court "refuse[d] to say that the absence of witnesses 'can never justify discontinuance of a trial.'" *Downum*, 372 U.S. at 737 (quoting *Wade v. Hunter*, 336 U.S. 684, 691, 69 S. Ct. 834, 93 L. Ed. 2d 974 [1949]).

This statement leaves dangling the questions of whether the strictest scrutiny always applies when a prosecution witness is unavailable and, even if applied, whether its application precludes declaring a mistrial depending on the reason the evidence has become unavailable. The State presents two lines of cases in arguing the trial judge did not err.

According to the State, one line supports the conclusion a mistrial is constitutionally permissible when some fatal defect occurs in the proceedings. It cites three United States Supreme Court cases for this proposition: *Illinois v. Somerville*, 410 U.S. 458, 471, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973) (holding manifest necessity supported granting mistrial when indictment was fatally defective under state law because the "defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice"); *Lovato v. New Mexico*, 242 U.S. 199, 201-02, 37 S. Ct. 107, 61 L. Ed. 244 (1916) (holding trial judge acted within discretion in dismissing jury to arraign defendant and take plea before reimpaneling and swearing

39

same jury for trial); and *Thompson v. United States*, 155 U.S. 271, 274, 15 S. Ct. 73, 39 L. Ed. 146 (1894) (holding manifest necessity supported mistrial when trial judge learned jury included a juror who had served on indicting grand jury). None involves a witness' failure to testify. The procedural irregularities that may have supported manifest necessity in those cases differ from the child witness freezing on the stand here. I, thus, do not find them helpful when analyzing the circumstances of this case.

More applicable is the second line of cases cited by the State. In those cases, courts found manifest necessity justified a mistrial when a prosecution witness became unavailable. Bowman, on the other hand, highlights four different decisions in which a prosecution witness was unavailable and argues they support his position. But three of Bowman's cases do not involve child witnesses. The one that does involves a 15 year old and very different facts. In addition, each is distinguishable because the prosecution either took no steps toward securing the witness' testimony or knew the witness was unavailable but allowed the jury to be sworn in anyway. These circumstances weighed on each court's decision to apply the strictest scrutiny when reviewing a mistrial order. See *State v. Gutierrez*, 333 P.3d 247, 254-55 (N.M. 2014) (recognizing that prosecutor had substantial reason before the court empaneled jury to question whether defendant's 15-year-old daughter would appear to testify based on her failure to appear for a pretrial interview and her repeated attempts to recant her testimony but prosecutor allowed jeopardy to attach by allowing court to administer oath to jury before determining if witness was present); *Walck v. Edmonson*, 472 F.3d 1227, 1238-41 (10th Cir. 2007) (holding double jeopardy protections applied when prosecution knew during voir dire that pregnant witness was in labor but still allowed jury to be sworn); *United States v. Stevens*, 177 F.3d 579, 587-89 (6th Cir. 1999) (holding double jeopardy protections applied when government lacked proof because its key witness refused to testify after repeatedly suggesting he would not do so out of fear for the safety of his family); *McNeal v. Hollowell*, 481 F.2d 1145, 1152-53 (5th Cir. 1973) (holding double jeopardy

40

protections applied  when government's case lacked proof after witness, who had participated in the crime, invoked his Fifth Amendment protection against self-incrimination without government seeking an agreement to secure testimony).

As the State argues, these cases cited by Bowman establish that manifest necessity may not support granting a mistrial when the State engages in misconduct, is aware a witness likely would not be available but proceeds anyway, or fails to take necessary steps to assure a witness is available. Unlike these cases, the State notes it took precautionary steps, the witness had given details of the alleged crimes to the detective, the State did not engage in misconduct, the witness was present at trial, and the witness had testified at the competency hearing. The State insists these facts allowed it to, in good faith, believe the witness would testify. The State also argues manifest necessity may support granting a mistrial when critical evidence becomes unexpectedly unavailable through circumstances not anticipated and beyond the prosecution's control.

Many cases support the State's position. In these cases, appellate courts affirmed trial judges who found manifest necessity supported granting a mistrial in those circumstances. E.g, *United States v. Mastrangelo*, 662 F.2d 946, 951-53 (2d Cir. 1981) (deferring to trial judge's manifest necessity determination after witness killed en route to court to testify when there was a distinct possibility defendant involved in making witness unavailable and government had no fault in circumstances); *Ogletree v. State*, 300 Ga. App. 365, 366-69, 685 S.E.2d 351 (2009) (holding manifest necessity supported granting mistrial when pregnant witness suffered complications making her unavailable for an uncertain amount of time and prosecutor did not act in bad faith in requesting continuance, applying Georgia Constitution); *Davis v. State*, 170 Ga. App. 748, 748, 318 S.E.2d 202 (1984) (holding manifest necessity supported trial judge's declaration of mistrial when witness held in secure juvenile shelter escaped and could not be located during brief continuance); *McCorkle v. State*, 95 Md. App. 31, 61-62, 619 A.2d 186

(1993) (affirming trial judge's exercise of sound discretion in declaring mistrial when key witness became ill and did not appear during trial and State prosecution was unable to locate witness despite doing everything it could to get witness to court); *State v. Connery*, 100 Nev. 256, 258, 679 P.2d 1266 (1984) (holding manifest necessity supported declaring mistrial when crime victim witness attempted suicide and became unavailable to testify); *State v. Dunns*, 266 N.J. Super. 349, 366-79, 629 A.2d 922 (1993) (holding although manifest necessity supported mistrial declaration where witness refused to testify even after lengthy period being jailed for civil contempt, dismissal was justified in unique circumstances of case; distinguishing *Downum* where the unavailability of the witness was due in some part to the prosecutor's lack of preparation); *State v. Messier*, 101 N.M. 582, 586-87, 686 P.2d 272 (Ct. App. 1984) (holding trial judge properly exercised discretion to declare mistrial when video testimony of child witness was inaudible and live testimony was not a possibility because of earlier ruling the child could not testify without suffering harm).

I find the State's cases more applicable and persuasive. The authors of 6 LaFave, Criminal Procedure § 25.2(c) assimilated 12 factors employed by courts when determining if the mistrial was a manifest necessity when a witness became unavailable, and the State's cases reflect these factors. These factors balance the competing interests of the defendant and the public. See *Washington*, 434 U.S. at 503-05. Under the facts here, these factors tilt toward a determination that the declaration of the mistrial was a manifest necessity. I will not discuss each factor or the facts supporting the State's position in detail. Suffice it to say the following circumstances support a conclusion the mistrial was a manifest necessity:  the State proceeded in conformity with Kansas law, the State moved to present the child's testimony through closed circuit television under K.S.A. 22-3434(a)(1), a competency hearing occurred, the judge allowed a comfort person, the State proceeded in good faith, the judge ruled based on indications the child would testify, the State did not manipulate circumstances so it would gain an advantage in a later

42

prosecution, the judge found the prejudice could not be cured, the judge thoroughly considered alternatives, the judge believed the jury had heard enough of the case to formulate some tentative opinions, the trial had not proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence, and, finally, there was nothing unusual about the jury's composition. See 6 LaFave, Criminal Procedure § 25.2(c).

On balance, after examining the circumstances and the trial judge's ruling with strictest scrutiny, I conclude the judge did not abuse his discretion in granting a mistrial here and the State met its burden in establishing that the mistrial was manifestly necessary. The *Washington* Court's words are appropriate here: "[T]he overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected." *Washington*, 434 U.S. at 511.

CONCLUSION

In conclusion, I disagree with the majority's interpretation and application of K.S.A. 2018 Supp. 21-5110. I would read that statute and K.S.A. 22-3423 as providing complementary grounds for declaring a mistrial without violating the statutory protection against double jeopardy. And I conclude the trial judge did not abuse his discretion in declaring a mistrial—a mistrial that was a manifest necessity. So a second prosecution will not violate K.S.A. 2018 Supp. 21-5110 or the protections against double jeopardy in the United States and Kansas Constitutions. For these reasons, I would deny Bowman's request for a writ of habeas corpus.

NUSS, C.J., and STEGALL, J., join in the foregoing dissent.

43